**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| BONITA GAYDEN AND JOHNNY LAMBERT, | ) |
|     Plaintiffs, | ) CASE NO.: 2:25-cv-464 |
| | ) |
|     v. | ) |
| | ) |
| CAESARS ENTERTAINMENT, INC., VICI | ) |
| PROPERTIES, HORSESHOE HAMMOND, LLC | ) |
| d/b/a HORSESHOE CASINO HAMMOND, and | ) |
| JOHN DOE ENTITIES 1–2. | ) JURY DEMAND |
|     Defendants. | ) |

**ORIGINAL COMPLAINT**

Plaintiffs **BONITA GAYDEN and JOHNNY LAMBERT**, by counsel, Danielle A. Pinkston of PINKSTON LAW GROUP, P.C., complain of **CAESARS ENTERTAINMENT, INC., VICI PROPERTIES, INC.; HORSESHOE HAMMOND, LLC D/B/A HORSESHOE CASINO HAMMOND, AND JOHN DOE ENTITIES 1–2**, stating as follows:

**PARTIES**

1.  Plaintiff Bonita Gayden is an adult, citizen of the United States, and resident of the State of Illinois.

2.  Plaintiff Johnny Lambert is an adult, citizen of the United States, and resident of the State of Illinois.

3.  Defendant Horseshoe Hammond, LLC d/b/a Horseshoe Casino Hammond (the "Casino") is a foreign limited liability company who conducts business at 777 Casino Center Dr, Hammond, Indiana. The Horseshoe Hammond, LLC owns, occupies, manages, and/or controls the gaming vessel and premises commonly known as Horseshoe Casino Hammond in Hammond, Indiana.

1

4. Defendant Caesars Entertainment, Inc., is a foreign corporation with its primary corporate office being located at One Caesars Palace Drive, Las Vegas, Nevada. Upon information and belief Caesars Entertainment, Inc., owns, manages, controls, and/or profits from the Horseshoe Casino Hammond and is vicariously liable for its agents and employees.

5. Defendant Vici Properties, Inc.,  is a foreign corporation with its corporate office being located at 535 Madison Avenue, 20th Floor, New York, New York. Upon information and belief Vici Properties owns, manages, controls, and/or profits from the Horseshoe Casino Hammond and is vicariously liable for its agents and employees.

6. Defendants John Doe Entities 1–2 are persons or entities whose identities are presently unknown who owned, operated, managed, maintained, inspected, and/or provided security or EMS services at the Casino.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the acts and injuries occurred here.

8. In addition, the parties are completely diverse in citizenship and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Jurisdiction is also proper pursuant to 28 U.S.C. Section 1332.

9. Venue is proper in this district under 28 U.S.C. § 1391 because Defendant conducts business in this district, and the events giving rise to this Complaint occurred within this district and the events giving rise to these claims occurred in Lake County, Indiana, within this judicial district.

10. The amount in controversy exceeds the jurisdictional minimums of this Court.

## FACTUAL ALLEGATIONS

11. On or about October 6, 2025, Plaintiffs visited Horseshoe Casino Hammond.

12. Plaintiff Johnny Lambert suffers from peripheral artery disease (PAD) and uses a wheelchair for long distances.

13. To board the Casino's gaming vessel/entrance, Plaintiffs proceeded down a ramp toward the doorway.

14. The path included carpet transitioning to a hard surface with a hidden dip/defect at or near the end of the carpet where it met cement/tiles.

15. The dip/steep change in level was not open and obvious to wheelchair users approaching from above; there were no cones, paint, edging, warnings, lighting, handrails, or guards to alert patrons, and the condition violated basic accessibility and safe-ingress principles.

16. As Ms. Gayden slowly pushed Mr. Lambert down the ramp toward the door, the wheelchair's wheels dropped suddenly into the concealed dip, causing the chair to pitch backward.

17. Ms. Gayden, using all her strength, attempted to hold the chair; but the sudden drop pulled both Plaintiffs down.

18. Mr. Lambert struck his head hard on the cement floor; Ms. Gayden also fell, sustaining injuries.

19. Immediately afterward, a Casino security guard stated words to the effect of: "I was just about to tell y'all to be careful going up the other ramp," acknowledging awareness of a steep/unsafe condition on the ramp Plaintiffs used and the need for a warning.

20. Plaintiffs requested ice packs for their injuries.

21. Casino EMS/security provided inadequate assistance and when Ms. Gayden requested additional ice for burning pain in her legs and arm, she was told there were no more.

22. Mr. Lambert required emergency care and was transported to Little Company of Mary Hospital where his head was markedly swollen and he was treated for head trauma and related injuries.

23. Ms. Gayden, age 61 at the time, had previously managed controlled osteoarthritis and rheumatoid arthritis and lived independently.

24. Following the fall, she developed significant right hand/wrist pain (burning, numbness, diminished grip consistent with recurrent carpal tunnel syndrome and thumb CMC osteoarthritis) and a severe aggravation/acceleration of bilateral knee osteoarthritis to end-stage, bone-on-bone disease, ultimately requiring total knee replacement and ongoing care.

25. Plaintiffs have incurred and will continue to incur medical expenses, pain and suffering, loss of normal life, and other damages as a direct and proximate result of Defendants' conduct.

## COUNT I — VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT (ADA)
(42 U.S.C. §§ 12181–12189; 28 C.F.R. pt. 36)
Failure to Provide an Accessible Route / Failure to Remove Architectural Barriers / Failure to Maintain Accessible Features
(Plaintiffs Against Horseshoe Hammond, LLC d/b/a Horseshoe Casino Hammond; Caesars Entertainment, Inc.; Vici Properties, Inc.; and John Doe Entities 1–2)

26. Plaintiffs incorporate and re-alleged paragraphs 1 through 25 into this Count as if fully stated herein.

27. Defendants operate a "place of public accommodation."

28. A casino is a place of public accommodation within the meaning of 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104. Defendants own, lease, operate, and/or control the Horseshoe

4

Casino Hammond premises and its public amenities, including the entrance ramp/boarding area described below.

29. Plaintiff Johnny Lambert has peripheral artery disease (PAD) that substantially limits one or more major life activities, including walking and standing.

30. He uses a wheelchair for distance mobility and is an individual with a disability within 42 U.S.C. § 12102.

31. Plaintiff Bonita Gayden has osteoarthritis and rheumatoid arthritis that substantially limit one or more major life activities, including walking, standing, lifting, and performing manual tasks; she is an individual with a disability within 42 U.S.C. § 12102.

32. On or about October 6, 2025, Plaintiffs visited the Casino.

33. To enter, they proceeded down a ramped approach where a carpeted surface transitioned to cement/tile at or near the doorway.

34. At that location there existed a concealed dip/abrupt change in level and/or excessive slope at the threshold/transition.

35. The condition caused Mr. Lambert's wheelchair to drop and pitch backward, pulling Ms. Gayden down and resulting in injuries.

36. The ramp/threshold area was not readily apparent to wheelchair users approaching from above and lacked handrails, edge protection, conspicuous warnings, contrasting nosings, bevels/transition strips, and adequate lighting.

37. Staff did not provide safe guidance to an alternate accessible route, despite a security guard's contemporaneous acknowledgment that another ramp should be used.

38. Pursuant to law, in 1990, the United States Congress made findings per 42 U.S.C. §12101 regarding persons with physical disabilities, finding that laws were needed to more fully

5

protect: some 43 million Americans with one or more physical or mental disabilities; [that] historically society has tended to isolate and segregate individuals with disabilities; [that] such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; [that] the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self-sufficiency for such individuals; [and that] the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous.

39. Congress stated as its purpose in passing the Americans with Disabilities Act of 1990 (42 U.S.C. §12102): It is the purpose of this act (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the Federal government plays a central role in enforcing the standards established in this act on behalf of individuals with disabilities; and (4) to invoke the sweep of Congressional authority, including the power to enforce the 14th Amendment and to regulate commerce, in order to address the major areas of discrimination faced day to day by people with disabilities.

40. As part of the Americans with Disabilities Act of 1990, (hereinafter the "ADA"), Congress passed "Title III - Public Accommodations and Services Operated by Private Entities" (Section 301 42 U.S.C. §12181, et seq.). Among the public accommodations identified for purposes of this title was:

> (7) PUBLIC ACCOMMODATION - The following private entities are considered public accommodations for purposes

of this title, if the operations of such entities affect commerce
- *** (A) an inn, hotel, motel or other place of lodging ***.
42 U.S.C. §12181(7)(A).

41. Pursuant to §302, 42 U.S.C. §12182, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or leases to, or operates a place of public accommodation."

42. The specific prohibitions against discrimination set forth in §302(b)(2)(a), 42 U.S.C. §12182(b)(2)(a) are: (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered; (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden; (iv) a failure to remove architectural barriers, and communication barriers

that are structural in nature, in existing facilities . . . where such removal is readily achievable; and (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages or accommodations available through alternative methods if such methods are readily achievable.

43. The acts of Defendants set forth herein were a violation of Plaintiffs' rights under the ADA, 42. U.S.C. §§ 12181 et seq.

44. On information and belief, construction work on, and modifications of, the business occurred after the compliance date for the Americans with Disabilities Act, January 26, 1992, independently triggering access requirements under Title III of the ADA; due to the date of construction, mandatory compliance is required and there is no readily achievable defense.

45. Pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §12188, et seq., §308, Plaintiffs are entitled to the remedies and procedures set forth in §204(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000(a)-3(a), as they are being subjected to discrimination on the basis of disability in violation of this title or have reasonable grounds for believing that he is about to be subjected to discrimination in violation of §302.

46. Mr. Lambert cannot return to or make use of the public facilities complained of herein so long as the premises and Defendants' policies bar full and equal use by persons with physical disabilities.

47. Per §308(a)(1) (42 U.S.C. 12188), "Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this title does not intend to comply with its provisions."

48. Pursuant to this last section, Mr. Lambert has not returned to Defendants' premises since on or about October 6, 2025, but on information and belief, alleges that Defendants have continued to violate the law and deny the rights of plaintiff and of other persons with physical disabilities to access this public accommodation.

49. Pursuant to §308(a)(2), "In cases of violations of §302(b)(2)(A)(iv) . . . injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this title."

50. Plaintiff seek relief pursuant to remedies set forth in §204(a) of the Civil Rights Act of 1964 (42 U.S.C. 2000(a)-3(a)), and pursuant to federal regulations adopted to implement the Americans with Disabilities Act of 1990, including but not limited to an order granting injunctive relief and attorneys' fees.

51. Title III requires public accommodations to ensure individuals with disabilities are not denied full and equal enjoyment of facilities and services, 42 U.S.C. § 12182(a); to remove architectural barriers where such removal is readily achievable, § 12182(b)(2)(A)(iv); to modify policies, practices, or procedures when necessary to afford access, § 12182(b)(2)(A)(ii); and to maintain accessible features in operable working condition, 28 C.F.R. § 36.211.

52. The 2010 ADA Standards for Accessible Design (incorporated by 28 C.F.R. pt. 36, app. D) require, among other things:

    1. Accessible routes with maximum running slope and cross-slope, firm/stable/slip-resistant surfaces (§§ 402–403);

    2. Changes in level: up to ¼ in. permitted; ¼–½ in. must be beveled 1:2; greater than ½ in. requires a complying ramp (§ 303);

3. Ramps meeting slope/width/landing/edge protection (and handrails where required) (§ 405);

4. Doorways/thresholds and flooring transitions complying with §§ 404/302. The subject ramp/transition failed one or more of the foregoing.

53. On information and belief, Defendants (a) constructed and/or altered the entrance/boarding route after the ADA's effective dates, triggering compliance "to the maximum extent feasible," and/or (b) maintained an existing architectural barrier that was readily achievable to remove (e.g., install a compliant threshold/transition strip; grind/feather or level the dip; install a short ramp; add edge protection/handrails; improve lighting/contrast and signage; close the unsafe route and direct patrons to a compliant route), and (c) failed to modify policies to warn, assist, or redirect wheelchair users.

54. Defendants also failed to maintain accessible features in operable working condition (28 C.F.R. § 36.211), by allowing the ramp/threshold to remain in a hazardous, non-compliant state and by not implementing an effective inspection, hazard-flagging, and patron-assistance protocol.

55. As a direct result of the barriers and policies described above, Plaintiffs were denied full and equal access to the Casino, deterred from returning, and subjected to unsafe conditions not imposed on non-disabled patrons.

56. Plaintiffs intend to return and/or would return to the Casino for entertainment and social visits but are deterred by the continuing barriers and the lack of reliable policies ensuring a safe, compliant accessible route.

57. The violations are capable of repetition and present a real and immediate threat of future injury absent injunctive relief.

58. Defendants' failures violate 42 U.S.C. § 12182 and 28 C.F.R. pt. 36.

59. As a direct and proximate result of the aforesaid acts and/or omissions, Plaintiffs sustained injury including severe and excruciating pain, past and future anxiety, medical expenses pain and suffering, shock, extreme emotional distress, and humiliation, inconvenience, embarrassment, mental anguish, deprivation of ordinary pleasures of life, loss of well-being, and equanimity, and their overall health, strength, and vitality have been impaired.

### COUNT II — PREMISES LIABILITY / NEGLIGENCE
(Plaintiffs Against Horseshoe Hammond, LLC d/b/a Horseshoe Casino Hammond; Caesars Entertainment, Inc.; Vici Properties, Inc.; and John Doe Entities 1–5)

60. Plaintiffs incorporate and re-allege paragraphs 1 through 25 into this Count as if fully stated herein.

61. On or about October 6, 2025, Plaintiffs Bonita Gayden and Johnny Lambert were business invitees lawfully on the premises of Horseshoe Casino Hammond in Hammond, Indiana.

62. Defendants, as owners/occupiers/managers of the Casino, owed invitees—including Plaintiffs—a duty of reasonable care to:

   a. Maintain the premises, ramps, thresholds, flooring transitions, and ingress/egress routes in a reasonably safe condition;

   b. Inspect for dangerous conditions that posed an unreasonable risk of harm;

   c. Warn of or make safe concealed hazards not open and obvious to invitees; and

   d. Provide safe, accessible routes for wheelchair users consistent with applicable codes, industry standards, and accessibility principles.

63. At the boarding/entrance area, the route from a carpeted surface to a hard cement/tile surface contained a hidden dip/abrupt change in level at or near the end of the carpet, on a ramped approach used by patrons—including those in wheelchairs.

11

64. The dip/height differential was not readily visible to patrons approaching from above and lacked adequate warnings, edging, lighting, cones, barriers, handrails, or attendants to alert or protect wheelchair users and their companions.

65. As Ms. Gayden slowly pushed Mr. Lambert (who suffers from peripheral artery disease/PAD and requires a wheelchair for distance) down the ramp toward the entrance, the wheelchair's front wheels dropped into the concealed dip, causing the chair to pitch backward and pulling Ms. Gayden to the ground.

66. Mr. Lambert struck his head on the cement floor and required emergency medical care (for head trauma and related injuries.

67. Ms. Gayden sustained injuries including right hand/wrist pain with burning, numbness, and reduced grip strength (consistent with recurrent carpal tunnel syndrome and thumb CMC osteoarthritis) and a severe aggravation/acceleration of bilateral knee osteoarthritis to end-stage disease, requiring emergency medical care, surgical intervention, and ongoing care.

68. Despite the hazard and staff awareness, Defendants breached its duty and:

    a. Failed to close, repair, level, or guard the dangerous transition, failed to post conspicuous warnings, failed to direct wheelchair users to a safer route, and failed to assign personnel to assist patrons where the hazard was known.

    b. Failed to maintain the premises, ramps, thresholds, flooring transitions, and ingress/egress routes in a reasonably safe condition;

    c. Allowed a dangerous change in level/dip at the carpet-to-hard-surface transition along the ramp/entrance;

    d. Failed to inspect, repair, level, or guard the defect that posed an unreasonable risk of harm;

e.  Failed to warn of or make safe concealed hazards with signage, edging, cones, lighting, mats, or attendants that were not open and obvious to invitees;

f.  Failed to maintain ADA-compliant accessible routes and safe ramp slopes/thresholds;

g.  Failed to train/assign staff to assist wheelchair users at known hazards; and

h.  Permitted use of a route that staff knew or should have known was hazardous, as evidenced by the security guard's statement;

i.  Failed to provide safe, accessible routes for wheelchair users consistent with applicable codes, industry standards, and accessibility principles, and

j.  Failed to conduct reasonable inspections and to comply with applicable codes and accessibility standards governing safe ramp slopes, thresholds, and level changes, and otherwise failed to exercise due care under the circumstances.

69. The acts and omissions constitute breaches of Defendants' duties to Plaintiffs.

70. Plaintiffs' injuries and damages were foreseeable to Defendants, who knew or should have known of the hazard through prior inspections, staff observations, and the nature of the ramp/transition, as reflected by the security guard's contemporaneous statement.

71. Defendants' negligence was a substantial factor in causing Plaintiffs' injuries and damages described herein.

72. As a direct and proximate result of the aforesaid acts and/or omissions, Plaintiffs sustained injury including severe and excruciating pain, past and future anxiety, medical expenses pain and suffering, shock, extreme emotional distress, and humiliation, inconvenience, embarrassment, mental anguish, deprivation of ordinary pleasures of life, loss of well-being, and equanimity, and their overall health, strength, and vitality have been impaired.

**COUNT III – NEGLIGENT TRAINING, SUPERVISION, AND RETENTION**

(Plaintiffs Against Horseshoe Hammond, LLC d/b/a Horseshoe Casino Hammond; Caesars Entertainment, Inc.; Vici Properties, Inc.; and John Doe Entities 1–2)

73. Plaintiffs incorporate and re-allege paragraphs 1 through 25 into this Count as if fully stated herein.

74. At all relevant times, Defendants owned, occupied, managed, and controlled the Horseshoe Casino Hammond premises, and hired, trained, supervised, scheduled, and retained the security, guest-services, maintenance, and EMS personnel who interacted with patrons and controlled ingress/egress to the gaming vessel/entrance ramps.

75. Defendants owed a duty of reasonable care to Plaintiffs and other business invitees to:

   a. Hire, train, supervise, and retain competent staff capable of identifying, correcting, or warning of hazards;

   b. Implement policies and procedures for routine inspection of ramps, thresholds, and flooring transitions, including conditions uniquely affecting wheelchair users;

   c. Ensure employees warn and/or redirect patrons from known hazards and close unsafe routes;

   d. Provide adequate first-aid/EMS response, including assessment, supplies, documentation, and timely escalation; and

   e. Enforce those policies through supervision and discipline so they are actually followed.

76. Defendants breached those duties by, among other acts and omissions:

   a. Failing to train staff to recognize and mitigate dangerous dips/changes in level at the carpet-to-hard-surface transition on the ramp to the boat entrance;

   b. Failing to train staff to provide or arrange assistance/escort for wheelchair users on ramps and at thresholds;

14

    c.   Failing to train or require staff to post conspicuous warnings, cones, edging/paint, signage, lighting, or barriers, or to direct patrons to a safer ramp;

    d.   Failing to train and supervise maintenance to inspect, level, repair, or take out of service a known hazardous transition;

    e.   Failing to communicate known hazards during shift changes or via incident reports and to enforce closure of the unsafe route until made safe;

    f.   Failing to train security and EMS to provide adequate first-aid and supplies (including ice packs) and to promptly summon appropriate medical care; and

    g.   Retaining employees and/or supervisors who failed to follow or enforce safety protocols.

77. Defendants, through their employees, had at least constructive—and, upon information and belief, actual—knowledge of the hazard. Immediately after Plaintiffs' fall, a security guard stated words to the effect of "I was just about to tell y'all to be careful going up the other ramp," evidencing awareness of the dangerous condition and the need for a warning or alternate route.

78. As a direct and proximate result of Defendants' negligent hiring, training, supervision, retention, Plaintiffs sustained injury including severe and excruciating pain, past and future anxiety, medical expenses pain and suffering, shock, extreme emotional distress, and humiliation, inconvenience, embarrassment, mental anguish, deprivation of ordinary pleasures of life, loss of well-being, and equanimity, and their overall health, strength, and vitality have been impaired.

79. Plaintiffs' harms were foreseeable, particularly given staff's contemporaneous acknowledgment of the unsafe ramp and the absence of warnings or assistance.

**COUNT IV – NEGLIGENT TRAINING, SUPERVISION, AND RETENTION**
**(SECURITY/EMS RESPONSE)**
(Plaintiffs Against Horseshoe Hammond, LLC d/b/a Horseshoe Casino Hammond; Caesars
Entertainment, Inc.; Vici Properties, Inc.; and John Doe Entities 1–2)

80. Plaintiffs incorporate and re-allege paragraphs 1 through 25 into this Count as if fully stated herein.

81. At all relevant times, Defendants owned, operated, managed, and/or controlled the premises known as Horseshoe Casino Hammond in Hammond, Lake County, Indiana, and employed or contracted with security and on-site EMS/first-aid personnel (collectively, "Security/EMS").

82. As proprietors inviting the public onto their premises, Defendants owed Plaintiffs and other business invitees a duty of reasonable care to hire, train, supervise, and retain competent Security/EMS personnel and to implement/enforce reasonable written policies and procedures for (a) responding to guest injuries and medical emergencies; (b) triaging suspected head/neck trauma and falls; (c) providing basic first aid and supplies; (d) promptly summoning emergency medical services/transport; (e) documenting, communicating, and escalating incidents; and (f) preserving and communicating known hazards to protect patrons from further harm.

83. Defendants breached those duties by, inter alia:

   a.  Failing to hire qualified Security/EMS staff with adequate training/credentials for guest injury response;

   b.  Failing to train Security/EMS to recognize and triage falls and head injuries, including red-flag symptoms requiring immediate stabilization and EMS activation;

   c.  Failing to stock and maintain adequate first-aid supplies (e.g., ice packs, cervical supports) and to train staff in their proper use;

16

d. Failing to establish, communicate, and enforce written post-incident protocols (incident command, scene safety, guest assessment, documentation, supervisor notification, EMS call criteria, guest monitoring, and discharge guidance);

e. Failing to supervise and audit Security/EMS compliance with those protocols (including shift-to-shift briefings and hazard handoffs);

f. Retaining personnel who were unqualified, indifferent, or non-compliant with safety protocols; and

g. After Plaintiffs' fall, negligently performing the response by whispering/confusing communications, providing inadequate first aid (including stating there were "no more" ice packs despite active pain and swelling), delaying or failing to promptly escalate to EMS transport, and failing to provide clear post-incident guidance.

84. As a direct and proximate result of the aforesaid acts and/or omissions, Plaintiffs sustained injury including severe and excruciating pain, past and future anxiety, medical expenses pain and suffering, shock, extreme emotional distress, and humiliation, inconvenience, embarrassment, mental anguish, deprivation of ordinary pleasures of life, loss of well-being, and equanimity, and their overall health, strength, and vitality have been impaired.

85. Plaintiffs' harms were foreseeable, particularly given Defendants' knowledge of the hazardous area and their undertaking to provide on-site Security/EMS services for injured patrons.

## COUNT V – NEGLIGENT UNDERTAKING
(Plaintiffs Against Horseshoe Hammond, LLC d/b/a Horseshoe Casino Hammond; Caesars Entertainment, Inc.; Vici Properties, Inc.; and John Doe Entities 1–2)

86. Plaintiffs incorporate and re-allege paragraphs 1 through 25 into this Count as if fully stated herein.

87. At all times relevant, Defendants owned, operated, and controlled Horseshoe Casino Hammond and undertook to render safety-related services for patrons, including but not limited to:

   a. Controlling and supervising ingress/egress routes (ramps, thresholds, carpet-to-hard surface transitions) to the gaming vessel/entrance;

   b. Directing and warning patrons—including wheelchair users—of hazards and/or guiding them to safe alternate routes; and

   c. Providing on-site security/EMS/first-aid services and arranging prompt emergency care for injured patrons.

88. Having undertaken those services—which Defendants should have recognized as necessary for the protection of patrons' physical safety—Defendants owed Plaintiffs a duty to exercise reasonable care in performing the undertaking and not to increase the risk of harm. See Restatement (Second) of Torts § 323 and/or § 324A.

89. Defendants breached that duty by negligently performing the undertaking, including but not limited to:

   a. Leaving in service and failing to barricade, guard, or mark a concealed dip/abrupt change in level at the carpet-to-cement/tile transition on a ramped approach to the entrance used by wheelchair patrons;

   b. Failing to post conspicuous warnings, edge paint, cones, lighting, handrails, mats, or signage, and failing to station personnel to assist wheelchair users at the known hazard;

   c. Failing to direct Plaintiffs to a safer alternate ramp despite a security guard's contemporaneous acknowledgment—"I was just about to tell y'all to be careful going

up the other ramp"—demonstrating actual knowledge of the dangerous condition and need for a warning;

d.   Failing to implement and follow reasonable inspection and communication protocols (including shift-to-shift hazard handoffs) for the ramp/threshold area; and

e.  After the fall, providing inadequate first-aid/EMS response (e.g., insufficient assessment for head trauma, inadequate supplies such as ice packs, delay/whispered responses, and failure to promptly escalate care), thereby exacerbating pain and risk.

90. Defendants' negligent performance increased the risk of harm to Plaintiffs and/or Plaintiffs reasonably relied on Defendants to perform the undertaking with reasonable care by allowing and directing patrons to use the subject route and by providing security/EMS services.

91. As a direct and proximate result of Defendants' negligent undertaking Plaintiffs sustained injury including severe and excruciating pain, past and future anxiety, medical expenses pain and suffering, shock, extreme emotional distress, and humiliation, inconvenience, embarrassment, mental anguish, deprivation of ordinary pleasures of life, loss of well-being, and equanimity, and their overall health, strength, and vitality have been impaired.

92. Plaintiffs' injuries were foreseeable consequences of Defendants' negligent performance of the safety and first-aid services they undertook to provide.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs **BONITA GAYDEN and JOHNNY LAMBERT** respectfully request judgment against Defendants, jointly and severally, for:

A. Grant judgment in favor of the Plaintiffs and declare that that Defendants' policies, practices, and architectural barriers at the entrance/ramp/threshold violate Title III of the ADA;

B. Enjoin the Defendants, its officers, agents, and employees, and all other persons in active concert or participation with the Defendants, from discriminating against individuals with disabilities and persons associated with them;

C. Order the Defendants to modify policies, practices, or procedures where necessary to afford individuals with disabilities a full and equal opportunity to participate in and benefit from Defendants' services, where such modifications do not result in a fundamental alteration;

D. Order the Defendants to develop and implement policies and procedures to provide the full and equal enjoyment of its facilities and services to its members with disabilities;

E. Order the Defendants to design and implement appropriate staff training members of the public (whether employees or independent contractors) are knowledgeable about the policies related to the provision of goods and services to persons with disabilities;

F. Order the Defendants to make the Horseshoe Casino Hammond readily accessible to and usable by individuals with disabilities.

G. Survey the premises with a qualified ADA consultant;

   1. Remediate the ramp/threshold/transition to comply with the 2010 ADA Standards (including, as applicable, leveling, compliant beveled threshold or short ramp, edge protection/handrails, contrasting nosings, lighting, and signage), or close the route and provide a fully compliant alternate accessible route;

   2. Adopt and implement written inspection/maintenance and patron-assistance/warning policies for accessible routes;

20

3. Train security/guest-services staff on accessible routing and assistance for wheelchair users; and

4. Monitor and maintain all accessible features in operable condition going forward (28 C.F.R. § 36.211).

H. An order awarding Plaintiffs their reasonable attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 12205;

I. Pre-judgment and post-judgment interest as allowed by law; and

J. All other just and proper relief.

## JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Dated: October 6, 2025,

Respectfully submitted,
**PINKSTON LAW GROUP, P.C.**

/s/ Danielle A. Pinkston

_____

Danielle A. Pinkston
30 N. Michigan Ave. Ste. #1004
Chicago, IL 60602
Office: (773) 770-4771
Fax: (773) 770-4772
dpinkston@pinkstonlawgroup.com
Atty. for: **BONITA GAYDEN And JOHNNY LAMBERT**